UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION
www.flmb.uscourts.gov

| | | |
|---|---|---|
| In re ) | | |
| ) | | |
| STEVEN D. BURG, ) | Case No. 6:11-bk-11909-KSJ | |
| ) | Chapter 7 | |
| Debtor ) | | |
| ) | | |
| | | |
| AIRWAY CENTER, LLC, ) | | |
| ) | | |
| Plaintiff ) | | |
| vs. ) | | |
| ) | Adversary No. 6:11-ap-00301-KSJ | |
| STEVEN D. BURG, ) | | |
| ) | | |
| Defendant. ) | | |
| ) | | |
| ) | | |

**MEMORANDUM OPINION DENYING
DEFENDANT'S DISCHARGE UNDER § 727(a)(3) and § 727(a)(5).**

The Defendant, Debtor, Stephen D. Burg, filed a Chapter 7 bankruptcy after he lost his self-made fortune in the stock market and three failed fitness centers. He claims he is entitled to a discharge of a $1.5 million judgment debt incurred for failure to pay rent on one of the fitness facilities owned by the Plaintiff, Airway Center, LLC ("Airway"). Airway objects to the Defendant's discharge arguing the Defendant provided materially false financial statements with intent to deceive it into executing a lease, and then the Defendant either concealed or failed to explain sufficiently the substantial loss of assets which otherwise would have been used to pay his creditors, including Airway's judgment debt. The Court finds the Defendant failed to provide the Court and the Plaintiff with financial information that would explain his financial

circumstances and justify a discharge. The Defendant failed to meet his fundamental obligations as a debtor and he is not entitled to a discharge.

The Defendant is a computer specialist who, in 2001, sold his computer company for a $12 million profit. He invested a substantial amount of his new wealth into the stock market and a created a personal fitness business called NeoLimits Fitness, Inc. ("NeoLimits"), and opened two locations in the Dayton, Ohio suburbs of Centerville and Beaver Creek. On March 22, 2006, NeoLimits opened a third fitness facility at a location close to the Dayton airport. He leased a 22,500 square foot commercial space from the Plaintiff, Airway Center, LLC ("Airway") for a term of ten years.[1]

To ensure payment of the Airway lease in the event NeoLimits defaulted, the Plaintiff required the Defendant to sign a personal guaranty. In conjunction with that guaranty, and to corroborate his financial health, the Defendant gave Airway a financial statement listing his personal net worth as $3,414,000.[2] This personal financial statement originally was prepared for the separate business purpose of obtaining a BankOne loan and later was updated by the Defendant "to the best of his abilities."[3] The financial statement dated January 9, 2006, listed $1,270,000 of real property, a Brown & Company brokerage account worth $653,000, a Neolimits company account worth $2,275,000, and other various stocks and investments. The director of leasing for Airway found the Defendant's $3.4 million net worth representation sufficient to move forward with the lease, and NeoLimits signed the lease at the Airway location in April 2006.

According to the Defendant, the Airway NeoLimits facility was "a disaster" from the start.[4] The Centerville location was the only facility that made any money, and it financially

---

[1] Doc. No. 21 at 3-4.
[2] Plaintiff's Exhibit No. 9. Testimony of Steven Burg, October 18, 2012.
[3] Testimony of Steven Burg, October 18, 2012.
[4] *Id.*

carried the other two locations for a short while.[5] By 2007, all three of the NeoLimits facilities were underperforming, and the Defendant was keeping the businesses afloat by injecting cash from his personal accounts to cover operating expenses.[6] During this time, the Defendant also started a fitness-based software company called StratusFit, LLC with a business partner, in the hopes that he could shift into a more familiar industry and stop operating fitness centers.

By mid-2008, NeoLimits was defaulting on the Airway lease on a regular basis. The Defendant, who remained personally obligated under the guaranty, approached Airway to modify the lease. He gave Airway a second net worth statement,[7] and Airway, in reliance on this updated financial statement, later agreed to reduce the rent at the Airway location for six months. The second financial statement offered by the Defendant to support NeoLimit's lease modification also was prepared for a third party, Huntington Bank. The Defendant's net worth listed in the updated statement had now increased to $5,400,000 "as June 15, 2007."[8] The financial statement showed the Defendant still had $2.2 million in a NeoLimits collateral account, $1million in a personal brokerage account with Brown & Co., and three parcels of real property totaling $1,502,000, and secured by debt of $896,000.

By the end of 2008, despite the rent relief, NeoLimits failed to bring its lease payments current, and Airway sued to evict.[9] On July 20, 2010, Airway obtained a final judgment against NeoLimits and the Defendant, jointly and severally, in the amount of $1,544,344.56 plus post-judgment interest.[10] On August 5, 2011, the Defendant filed for Chapter 7 bankruptcy.[11] Airway filed an unsecured proof of claim based on its state court foreclosure judgment.[12]

---

[5] *Id.*
[6] Testimony of Steven Burg, October 18, 2012.
[7] Plaintiff's Exhibit No. 6.
[8] *Id.*
[9] Case No. 10-CV-00511 in the Common Pleas Court of Montgomery County, Ohio, Civil Division.
[10] Plaintiff's Exhibit No. 14.
[11] Case No. 11-bk-11909-KSJ.
[12] Proof of Claim No. 4.

The Chapter 7 Trustee initiated discovery of the Defendant's assets and conducted a meeting of creditors on September 7, 2011. The Defendant's bankruptcy schedules listed assets of only $204,000 consisting of a residential homestead valued at $198,000, a Bank of America checking account containing $222.35, a Stratusfit account with $4,500, and various other *de minimis* personal property.[13]

Airway later conducted a 2004 Examination of the Defendant on September 26, 2011.[14] The Defendant was instructed to bring copies of all financial information relevant to the Defendant's finances, including tax returns, bank and brokerage account statements, documents evidencing ownership of real and personal property, bills of sale, and all other financial statements or loan applications relating to the Defendant's personal and business affairs.[15] In addition to the usual boilerplate financial documents, Airway specifically requested that the Debtor bring any documents relating to the Defendant's house located in Orlando, Florida, the disposition of his 2007 Corvette, any ownership interests in or income derived from NeoLimits, and any information relating to how he spent personal or business funds over the past few years.[16]

At the 2004 Examination, Airway inquired at length about how and where the Defendant had spent the $2.2 million collateral account, $1 million Brown & Co. brokerage account, approximately $20,000 in proceeds from the sale of his Corvette, a $21,000 tax refund, and $84,000 in consulting fees received for advising the new owners of the Centerville NeoLimits facility. Airway also inquired about the accuracy of the net worth representations in the two financial statements he provided to them.

The Defendant asserted that nearly all his net worth was gone and that he spent his brokerage account, tax refund, consulting fee, and car proceeds on a $139,000 down payment for

---

[13] Doc. No. 1 in Case No. 11-bk-11909.
[14] Doc. No. 15 Transcript of 2004 Examination held September 26, 2011.
[15] Doc. No. 10 in Case No.11-bk-11909 Notice of Rule 2004 Examination *Duces Tecum*.
[16] *Id.*

a new home in Florida,[17] $15,000 and $20,000 in credit card debt incurred to pay his accountant, and used the rest on miscellaneous living and business expenses.[18] However, he has not provided any documentation to support any of these claims. He does admit that the financial statements as a whole significantly overstated his net worth because they omitted some liabilities and overlooked certain ownership distinctions.[19] The Defendant also confessed the appraisal amounts were not from real appraisals but estimates.[20]

As Airway continued to pressure the Defendant to provide support for the loss of funds, the Defendant repeatedly assured Airway he had the credit card statements, invoices from his accountant, personal tax returns, bill of sale from his Corvette, and supporting bank records.[21] The Defendant said he would retrieve the records from a storage garage in Ohio.[22] He never did. Eventually, the Defendant *did* provide six months of personal bank account information showing many large withdrawals,[23] which the Defendant ambiguously attributed to "living expenses," but he failed to provide any of the other financial information as promised.

Airway and the Defendant were unable to resolve the dispute though mediation, and a trial was set for October 2012. At trial, in defense of Airway's accusations that the Defendant defrauded Airway into executing a lease and lease modification, the Defendant simply claimed the errors and omissions in the two financial statements were not intentional because he "did not spend five minutes looking at them when [he] handed [them] over [to Airway]. At that time my

---

[17] Steven Burg Deposition September 26, 2011 at 28-29.
[18] *Id*. at 12, 18.
[19] Doc. No. 15 at 44-45 (reiterated in the Testimony of Steven Burg, October 18, 2012).
[20] *Id.* at 50-51.
[21] Doc. No. 15 at 12 (stating he has information from sale of Corvette and financial statements, affidavits, and maybe loan or credit applications in a storage unit in Ohio); at 15 (stating he will provide Neofitness tax returns); at 16 (stating he incurred $15,000 - $20,000 in credit card debt, but not agreeing to provide the information); at 18 (agreeing to provide bills from his accountant); at 19 (agreeing to provide credit card statements); at 25-26 (agreeing to retrieve financial information from Ohio regarding his NeoLimits businesses); at 34 (agreeing to provide documents regarding the purchase of his Orlando home); at 71 (agreeing to provide additional bank account information).
[22] *Id*. at 13-25.
[23] *See* Doc. No. 15 at 65-79 (describing the Defendant's checking accounts and identifying debits of $3,000 – $5,000); Hearing October 18, 2012 (discussing Exhibits 17 – 24 referencing large ATM cash withdrawals of $1,780 (March / April 2011), $1,940 (April / May 2011); $1,180 (May/June 2011), $1,080 (June/ July 2011), and miscellaneous withdraws of $5,400 from a pay pal account).

personal financial statements were not an issue. I had more money than I knew what to do with and did not worry what the specific numbers ever said. . . . All I know is that the financial statement says a number at the bottom and that was what [Airway] needed for the lease."[24] The Defendant further contended that Airway could not have justifiably relied on the financial statements because they were stale and created for use by BankOne and Huntington Bank and not specifically prepared for Airway by the Defendant.[25]

The Defendant again attempted to explain the loss of a significant portion of his net worth. He testified that the $2 million NeoLimits account actually had a corresponding debt of the same amount, and that the lender wiped out the account when Neolimits could not repay the debt. He admitted the account always was owned by NeoLimits, not him personally, and he never should have listed it on his personal financial statement in the first place. He reiterated that much of the rest of the funds went to pay living expenses or support his failing businesses.

Airway does not accept the Defendant's flip excuse for his admitted false financial statements and his vague and unsupported explanation for the loss of over $1 million. Airway has filed this adversary proceeding to deny the Defendant's discharge and request the nondischargeability of its judgment debt against the Defendant for failing to adequately explain the disappearance of his assets, for providing materially false financial statements with the intent to deceive, and for failing to identify certain assets on his schedules.[26] In Count I of the Complaint, Airway alleges that the BankOne and Huntington financial statements offered by the Defendant were materially false and the Defendant provided them to deceive Airway into executing a lease and lease modification, and the judgment debt owed to Airway should be found nondischargeable under § 523(a)(2)(B).[27] Count II claims the Defendant, with the specific intent to deceive, failed to identify the existence of a PayPal account owned by StratusFit, and he

---

[24] *Id.*
[25] Doc. No. 5 at 2.
[26] Doc. No. 1.
[27] Doc. No. 1 at 5.

should be denied a discharge pursuant to § 727(a)(2). Counts III, IV, and V allege the Defendant concealed, destroyed, or otherwise failed to keep accurate records of his assets, failed to explain adequately the loss of these assets, and knowingly and fraudulently withheld information from the trustee, the Court, and Airway, and for these wrongs the Defendant should be denied a discharge under § 727(a)(3), § 727(a)(4)(D), and § 727(a)(5) respectively.[28] Plaintiff's Counts III and V rely on the same set of facts that, regardless of intent to deceive, the Defendant should be denied a discharge for failing to keep sufficient records or provide the Court and creditors with a satisfactory explanation of the disappearance of over $1 million in assets.

The Defendant does not dispute he sold his Chevrolet Corvette and netted a significant, but still undetermined amount of money,[29] and then either destroyed, does not have, or refused to provide documentation of the transaction. The Defendant indisputably never produced financial statements from its fitness company NeoLimits that might show transfers of assets. The Defendant clearly failed to disclose the existence of a StratusFit Pay Pal account on his bankruptcy schedules. The Defendant also received and spent $84,000 from a consulting job and then failed to disclose how that money was spent. Most troubling, the Defendant has failed to adequately explain how more than $1,000,000 disappeared from his Brown & Co. brokerage account. Perhaps he lost the money through poor investments, but the point is the Defendant simply has not explained the loss.

Under § 727(a)(3), a debtor may be denied a discharge if "the debtor has concealed, destroyed, mutilated, falsified, or *failed to keep or preserve any recorded information*, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case."[30] The purpose of §727(a)(3) is to give creditors and the bankruptcy

---

[28] Doc. No. 1 at 7-9.

[29] Steven Burg Deposition September 26, 2011. The Defendant has testified that he received $32,000 (at pg. 11) $36,250 (at pg. 73).

[30] 11 U.S.C. § 727(a)(3) (emphasis added).

court a complete and accurate picture of the status of a debtor's affairs, and to test the completeness of the disclosure requirements necessary obtain a discharge.[31] This statute also ensures that the trustee and creditors receive dependable information on which they can rely in tracing a debtor's financial history. There is not a defined look-back period; the Court should consider documents tracing a debtor's financials for a reasonable time. "A 'reasonable period' under section 727(a)(3) varies on a case-by-case basis, but is understood to encompass at least the two year period prior to the filing of the bankruptcy petition."[32]

A creditor objecting to a discharge under § 727(a)(3) has the initial burden of proving a debtor's failure to maintain and preserve adequate records has made it impossible to understand a debtor's financial condition.[33] The burden then shifts to the debtor, who may overcome the claim by testifying as to the time, place, and amount of financial transactions, as long as the information is easily subject to verification or corroboration.[34] Even a complete lack of financial records may not be fatal, however "vague and indefinite explanations of losses such as claiming "monies were spent or lost through gambling" is unacceptable.[35] A debtor is required to produce at least *some* kind of direct and specific evidence to defeat an objection to discharge if his explanations are vague or ambiguous.[36] The question of whether a debtor satisfactorily explains a loss of assets is a question of fact, and it need not convince every objecting creditor; it simply must convince the court.[37]

When ruling on a creditor's opposition to discharge, a bankruptcy court may consider a defendant's level of sophistication, his business experience and education, the size and complexity of his business, his personal financial structure, and any other special circumstances

---

[31] *In re Bratcher*, 289 B.R. 205, 217-18 (Bankr. M.D. Fla. 2003).
[32] *In re Hahn,* 362 B.R. 542, 548 (Bankr. S.D. Fla. 2007).
[33] *In re Bratcher*, 289 B.R. at 217-18.
[34] *Id.* at 218.
[35] *In re MacPherson*, 129 B.R. 259, 261 (M.D. Fla. 1991) (citing *In re Goblick,* 93 B.R. 771, 775 (Bankr.M.D.Fla.1988)).
[36] *Id.* (emphasis added) (citing *In re Ridley,* 115 B.R. 731, 737 (Bankr.D.Mass.1990)).
[37] *Id.* at 261 (citing *In re Chalik,* 748 F.2d at 619)).

that may exist, including the financial condition of closely held businesses.[38] The amount of records actually produced in relation to the amount of records requested also is relevant. Where a debtor is able to produce most, but not all of the records requested, a court may look to the honest intent of a debtor in his attempts to produce the information.[39]

The denial of discharge under § 727(a)(3) is not accompanied by the requirement that the objecting party prove a debtor acted with an actual intent to hinder, delay or defraud a creditor or the court. Simply failing to keep or preserve information may render a debtor ineligible for discharge because every debtor has a duty to educate creditors about what he did with the assets in his own estate. If a debtor fails to establish enough facts to justify his lack of records, a discharge should be denied.

In this case, the Court cannot approve the Defendant's discharge because he has not provided any relevant information regarding his substantial loss of assets, except to state he used the monies to fund NeoLimits operations and to pay living expenses. The bank statements he did produce merely corroborate that he used large sums of cash on *something*, but they do not account for the financial losses from the Defendant's brokerage account, nor do they explain where funds exceeding normal living expenses were spent.[40] The Court also considers noteworthy the Defendant's allegedly low living expenses. The Defendant testified in his deposition on September 26, 2011, and at the trial on October 18, 2012, that he drives a car owned by his parents and pays less than a thousand dollars per month towards his home mortgage.[41] The Defendant has not testified as to any other personal debt or extraordinary living expenses that would justify withdrawals of thousands of dollars of cash each month.

---

[38] *In re Greene*, 340 B.R. 93, 99 (Bankr. M.D. Fla. 2006). See also *In re Womble*, 108 F. App'x 993, 996 (5th Cir. 2004) (upholding a denial of discharge under § 727(a)(3) because the debtor failed to keep adequate financial records with respect to the transactions between himself and the other business ventures in which he was involved).
[39] *In re Laing*, 329 B.R. 761, 775 (Bankr. M.D. Fla. 2005).
[40] *See* Doc. 21 at 15 (describing the large cash withdrawals in detail).
[41] Doc. No. 19 at 72 (stating at trial his monthly mortgage payment is $450). This contradicts the Defendant's testimony at the 2004 Examination on September 26, 2011, that his monthly mortgage payment is $800 (Doc. No. 15 at 19).

The Defendant has continued to tell both Airway and the Court that he had the documents to support all of his expenditures and the loss of funds from his business accounts, but he has not provided any additional information. Not a shred. The Defendant's alternative explanation, that he would have provided them had he known he was required to do so, simply is disingenuous.[42] In August, 2011, the Defendant was served with a notice *Duces Tecum* to provide a list of over thirty items that would help support his testimony, yet he failed to produce even one piece of helpful evidence. In his deposition in September, 2011, the Defendant again was asked to bring documents to support his testimony, and again he claimed he had records but failed to provide any. The Defendant had yet other opportunity to provide the requested information at the trial in October 2012, and for the final time, the Defendant again showed up empty handed.

This complete disregard for the bankruptcy process alone justifies the denial of discharge. The documents that Airway requested to trace the loss of more than $1 million are not novel or extraordinary. Items such as credit card information, invoices, and company records kept by an accountant should be easily accessible. In fact, a debtor like Mr. Burg, who has testified he is a businessman and understands financial statements and operations, should be held to a higher standard to produce these records than an unsophisticated wage earner.[43] Furthermore, the Defendant has testified on multiple occasions that he in fact has them. The Court could draw the inference that the Defendant is intentionally concealing this information from his creditors, or, at the very least, has been so careless that he cannot tell the Court where his assets really went. But the Court has no reason to make this inference because failing to provide basic financial information alone is a reason to deny discharge. Count III is granted in favor of the Plaintiff, and the Defendant's discharge is denied under § 727(a)(3).

The Defendant's discharge also is denied under 727(a)(5) in Count V. Section 727(a)(5) prohibits a debtor's discharge if a debtor "fails to explain satisfactorily, before determination of

---

[42] Testimony of Steven Burg, October 18, 2012. *See* Doc. No. 21 at 16-17.
[43] *In re Davis*, 363 B.R. 614, 620 (Bankr. M.D. Fla. 2006).

denial of discharge under this paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities." A prima facie case under § 727(a)(5) exists where a creditor shows there was an unusual and unexplained disappearance of a debtor's assets shortly before filing bankruptcy.[44] The burden then shifts to the defendant to explain the losses.[45] Similar to § 727(a)(3), the determination of whether a debtor satisfactorily explains a loss of assets is a question of fact which must "convince the judge."[46] The defendant has not done so. His failure to adequately explain a significant loss of money, and his failure to support his explanation with any information that should be readily available is inexcusable.[47] Count V is granted in favor of the Plaintiff, and the Defendant's discharge is denied under § 727(a)(5).

A denial of discharge is a rare and infrequent event in this Court. Indeed, objections to discharge should be construed in a light most favorable to a debtor.[48] However, a discharge in bankruptcy is a privilege, not a right.[49] The Defendant's discharge is denied under Counts III and V. The Court declines to rule on Counts I, II, and IV at this time as unnecessary. A separate Final Judgment consistent with this memorandum opinion shall be entered.

DONE AND ORDERED in Orlando, Florida this 29th day of March, 2013.

_____
KAREN S. JENNEMANN
Chief United States Bankruptcy Judge

---

[44] *In re Bratcher*, 289 B.R. 205, 219 (Bankr. M.D. Fla. 2003) (citing *PNC Bank,* 246 B.R. at 116 (quoting *Ernst v. Walton (In re Walton),* 103 B.R. 151, 155 (Bankr. S. D. Ohio 1989)).
[45] *Id. See also In re Hawley*, 51 F.3d 246, 249 (11th Cir. 1995).
[46] *Id.*
[47] *In re Chalik*, 748 F.2d 616, 620 (11th Cir. 1984) (finding the record clearly showed the debtor failed to explain his loan of $130,000 and subsequent dissipation of assets, and provided no documentation to support his testimony that he "can't find them really is where it is at.").
[48] *In re Sadler*, 282 B.R. 254, 262 (Bankr. M.D. Fla. 2002).
[49] *In re Hahn,* 362 B.R. 542, 546 (Bankr. S.D. Fla. 2007).